

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00129-CV

_____

IN THE INTEREST OF A.C., A CHILD

On Appeal from County Court at Law No. 1
Parker County, Texas
Trial Court No. CIV-17-0037

Before Sudderth, C.J.; Meier and Birdwell, JJ.
Memorandum Opinion by Justice Meier

**MEMORANDUM OPINION**

Appellants A.L.C. (Mother) and A.S.S. (Father) appeal a final order terminating their parental rights to their child A.C. Mother raises seven issues. Father raises two. We will affirm.

## I. BACKGROUND

Mother and Father married in November 2014. At the time of the February 2018 final trial, Mother was thirty-nine years old and Father was fifty-seven years old.[1] Born in January 2016, A.C. was two years old at the time of trial. Mother and Father lived together on several occasions but were separated at the time of trial.[2]

On July 1, 2016, when A.C. was five-and-one-half-months old, Appellee Texas Department of Family and Protective Services (TDFPS) visited Mother's residence to investigate concerns that Mother was co-sleeping with A.C. after drinking excessively and was driving while under the influence with A.C. in the car. Mother admitted to co-sleeping with A.C. while under the influence and made a number of statements that confirmed TDFPS's concerns about her mental health. TDFPS concluded that

---

[1]Father has been married four times and has five adult children.

[2]Father sued Mother for divorce in Hood County in December 2016. As explained below, the cause was later transferred to Parker County, where this termination action was filed.

Mother's residence was not a safe environment for A.C., and Mother voluntarily placed A.C. with S.S., Mother's great-aunt.[3]

Mother and Father agreed to work services through Family Based Safety Services (FBSS), but in January 2017, TDFPS filed its original petition for protection of A.C., for conservatorship, and for termination of the parent-child relationship due to lingering concerns about Mother's mental health and both parents' failure to follow service-plan recommendations. TDFPS again prepared service plans for Mother and Father, but they were not successfully completed.

After a lengthy jury trial, the trial court signed a final order on the jury's verdict terminating Mother's and Father's parental rights to A.C., finding by clear and convincing evidence as to both parents that termination was (i) appropriate under subsections (D), (E), and (O) of family code section 161.001(b)(1) and under family code section 161.003 and (ii) in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (b)(2), 161.003 (West Supp. 2018).

## II. JURISDICTION

In her first issue, Mother argues that the trial court lacked jurisdiction to enter the final termination order. Mother's argument is premised upon the misconception that family code section 103.001 is jurisdictional.

---

[3]This was TDFPS's second investigation involving A.C. The first occurred when, against medical advice, Mother took newborn A.C. to a different hospital because Mother did not think that A.C. was receiving appropriate treatment.

3

Entitled "Venue for Original Suit," family code section 103.001 provides that "an original suit shall be filed in the county where the child resides, unless" "(1) another court has continuing exclusive jurisdiction under Chapter 155" or "(2) venue is fixed in a suit for dissolution of a marriage under Subchapter D, Chapter 6." *Id.* § 103.001(a)(1), (2) (West Supp. 2018) (footnote deleted). Referencing both section 103.001's general provision and its subsection (2), Mother argues that the trial court lacked jurisdiction because when the Department filed its original petition in Parker County, A.C. resided in Comanche County and Father had a pending divorce action in Hood County. But "[s]ection 103.001 is not jurisdictional"—it "is a venue statute that determines the proper county to bring a suit affecting the parent-child relationship." *Gutierrez v. Gutierrez*, No. 05-14-00803-CV, 2016 WL 1242193, at *1 (Tex. App.—Dallas Mar. 30, 2016, no pet.) (mem. op.); *see* Tex. Fam. Code Ann. § 103.002 (West 2014) (providing that suit shall be transferred on timely motion if brought in improper county). Jurisdiction and venue are not synonymous. Subject-matter jurisdiction refers to the court's power to hear a particular type of suit, while venue pertains to where—or in which county—a suit may be brought. *Scott v. Gallagher*, 209 S.W.3d 262, 264 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Because it may be waived, venue is not 'jurisdictional.'"). Contrary to Mother's argument, family code chapter 103 does not govern the jurisdictional inquiry; chapters 152 and 155 do.

A trial court may acquire continuing, exclusive jurisdiction over the parties and subject matter of a suit affecting the parent-child relationship. *See* Tex. Fam. Code Ann. § 155.001 (West Supp. 2018). During the existence of this continuing, exclusive jurisdiction, "no other court of this state has jurisdiction of a suit with regard to that child except as provided by [Chapters 155 and 262 of the family code]." *Id.* § 155.001(c); *In re G.R.M.*, 45 S.W.3d 764, 766–67 (Tex. App.—Fort Worth 2001, no pet.). But a trial court acquires continuing, exclusive jurisdiction only "on the rendition of a final order." Tex. Fam. Code Ann. § 155.001(a). When no court has continuing, exclusive jurisdiction, "a court of this state has jurisdiction to make an initial child custody determination" if "this state is the home state of the child on the date of the commencement of the proceeding." *Id.* § 152.201(a)(1) (West 2014).

Here, no final order was entered in the Hood County lawsuit, nor was a final order ever entered in a suit affecting the parent-child relationship filed by the Attorney General in Erath County in May 2016. Thus, no court had continuing, exclusive jurisdiction, and the Parker County Court at Law, which is obviously located in Texas, had jurisdiction over the Department's lawsuit upon its filing. *See id.*

To the extent that Mother's argument can liberally be construed to also challenge venue as it is correctly understood, although venue was originally proper in Hood County, *see id.* § 103.001(a)(2), on Father's motion, the Hood County Court at Law transferred the divorce action to Parker County (where Mother resides) four days

5

after the Department filed its original petition there.[4]  Venue was thus proper in Parker County.  *See id.*  We overrule Mother's first issue.

### III.  ENDANGERMENT AND BEST INTEREST FINDINGS

Mother argues in her second issue and Father argues in his first issue that the evidence is both legally and factually insufficient to support each of the jury's termination findings.  We limit our analysis to the subsection 161.001(b)(1)(D) and (E) and best interest findings.  *See In re J.G.S.*, 550 S.W.3d 698, 703 (Tex. App.— El Paso 2018, no pet.) (stating that only one predicate finding under section 161.001(b)(1) is necessary when there is also an affirmative best interest finding).

### A.  Burden of proof and standard of review

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in family code section 161.001(b)(1) and that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

---

[4]Also, the Erath County district court transferred the Attorney General's suit to Parker County six days after the Department filed its petition.

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that TDFPS proved the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

We are required to perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support the termination of a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated subsections (D) and (E) of section 161.001(b)(1) and that termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is

so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B.     Subsection 161.001(b)(1)(D) and (E)

The trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endanger the physical or emotional well-being of the child.   Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection (D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.— Fort Worth 2000, pet. denied).  A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *See In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

The trial court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangers the physical or emotional well-being of the child.   Tex. Fam. Code Ann. § 161.001(b)(1)(E).  Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act.

8

*In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *Id.* Subsection (E) does not require that conduct be directed at a child or that the child actually suffers injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Endangerment—meaning to expose to loss or injury, to jeopardize—can take many forms. *J.T.G.*, 121 S.W.3d at 125–26. Although mental illness alone is not a ground for terminating the parent-child relationship, untreated mental illness can expose a child to endangerment. *S.R.*, 452 S.W.3d at 363. Excessive alcohol consumption is relevant in determining whether a parent engaged in endangering conduct. *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.). Parental illegal drug use supports a conclusion that the child's surroundings endanger his physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. Domestic violence may be considered evidence of endangerment. *S.R.*, 452 S.W.3d at 361. Criminal conduct is relevant to a review of whether a parent has engaged in a course of conduct that endangered the well-being of the child. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.). A parent's failure to complete a service plan may be considered as part of an endangerment analysis under subsection 161.001(b)(1)(E). *In re P.H.*, 544 S.W.3d 850, 858 (Tex. App.—El Paso

2017, no pet.). And a factfinder may permissibly infer from past conduct endangering the well-being of the child that similar conduct will recur if the child is returned to the parent. *In re A.N.D.*, No. 02-12-00394-CV, 2013 WL 362753, at *2 (Tex. App.—Fort Worth Jan. 31, 2013, no pet.) (mem. op.).

Because the evidence pertaining to subsections 161.001(b)(1)(D) and (E) is interrelated, we conduct a consolidated review. *See J.T.G.*, 121 S.W.3d at 126.

## C.  Mother's Endangerment Finding

### 1.  Mental Health

Both at trial and on appeal, Mother has repeatedly argued that TDFPS believes that she is mentally ill—and should have her parental rights to A.C. terminated—solely on account of her unconventional religious beliefs.[5]  But this trial theory was impliedly rejected by the jury and mischaracterizes the evidence.  Viewed objectively, the record contains an abundance of evidence that TDFPS sought to terminate Mother's parental rights not on account of her religious beliefs but instead because she suffers from untreated and unacknowledged mental health issues that endanger A.C.'s physical or emotional well-being.

---

[5]Among other things, Mother believes that "[w]hen you rapture to heaven, either you have the mark of the beast and you will finish transforming into the goat or the sheep.  And then you will eat each other.  That's what the last supper is"; that every egg she ovulated beginning at age thirteen that did not result in a live birth was two miscarried children; that A.C. is the reincarnation of Cain and the placenta from his birth is Abel; that Father is Satan; and that she is Daughter Zion.  When questioned about her religious beliefs and Facebook postings, Mother proclaimed, "It's freedom of speech.  Freedom of press.  Freedom of religion."

10

Specifically, Mother was involuntarily committed to North Texas State Hospital (NTSH) for eight days in 2010. She had been smoking methamphetamine, and she broke a van's window with a horseshoe and commented that she thought people were cutting off heads. NTSH diagnosed Mother as bipolar with psychotic features and prescribed her medication, which Mother took while she was admitted but not after being discharged. At trial, Mother claimed that NTSH had only "evaluated" her but had never "admitted" her. She claimed that nothing was wrong with her, that she had been misdiagnosed as bipolar, and that she was not currently bipolar. Dr. Parnell Ryan, a psychologist who evaluated Mother, opined that bipolar disorder is never completely cured. He also opined that a person can be very spiritual and still have psychosis.

Mother testified that FEMA has 800 concentration camps located across the United States (including one in Fort Worth) that it uses for homeless people; that FEMA has 500,000 coffins, 120,000 shackles, and over 30,000 guillotines "to chop people's heads off with"; and that martial law will be going into effect at some point. Dr. Donald Lane, a licensed marriage and family therapist who worked with Mother, testified that she never exhibited any symptoms of bipolar disorder when he was working with her, but he admitted that Mother had not told him any of her opinions involving FEMA and that if she had, her statements "definitely could have had some influence on my opinion, as far as psychosis goes." Similarly, Dr. Ryan diagnosed Mother as having unspecified bipolar and related disorder in full remission, but he

11

conceded that had Mother disclosed her thoughts about concentration camps and FEMA, then his diagnosis would have changed because "that's a little bit out of reality so there's a form of psychosis."

In 2016, Mother notified the Sheriff's Office that she heard voices all the time, that they threatened her, and that they told her that Father was cheating on her. On the day that TDFPS removed A.C., Mother stated that there were spies, that she could hear voices through her home's vents, that A.C. had a twin who had been kidnapped by the CIA, and that she sees a double named Jessie who stands behind her and wears blue clothes. At a meeting following A.C.'s removal, Mother again claimed that she had heard voices coming from the vents in the house. Mother thought the auditory hallucinations were those of an organized crime group that had run her over with a truck years earlier and were stalking her and seeking revenge against her because she had reported insurance fraud. At one point during the case, Father said that Mother was schizophrenic, bipolar, or both.

At some point, Mother removed all of the electric appliances from her home because they were making a humming sound. Mother could not recall how many times she had made police reports about "wire tapping and stuff," but it was probably "a lot." And finally, Mother once claimed that she could communicate telepathically with A.C.

Despite all of the above, Mother belligerently denied that she suffers from any mental health illness and needs medication: "I don't take medication . . . . I don't need medication. I'm not -- there's nothing wrong with me."

### 2. Alcohol and Illegal Drug Use

Mother has convictions for DWI and public intoxication, and S.S. testified that Mother drank heavily and became intoxicated at annual Thanksgiving gatherings. Father once said that "there's been times where you could classify [Mother] as a binge drinker."

TDFPS initiated the underlying case to investigate concerns that Mother was co-sleeping with A.C. after drinking excessively and was driving while under the influence with A.C. in the car. Mother admitted to drinking five to six beers at a time and to co-sleeping with A.C. after consuming alcohol.

Mother continued drinking and driving during the pendency of the case. Two of Mother's neighbors testified that she showed up at their homes intoxicated and that a beer can fell out of her car when she opened the door. Just as she had denied having any mental illness, at trial, Mother denied having any problem with alcohol.

During an MHMR assessment, Mother told a nurse that she had smoked marijuana from age twelve to age twenty-three. Mother used methamphetamine before being admitted to NTSH, and she has at least one conviction for possessing a controlled substance.

13

### 3. Anger/Domestic Violence/Physical Altercations/Arrests

Mother has a history of domestic violence, physical altercations, and arrests. While pregnant with A.C., Mother and Father got into a fight during which Father strangled Mother, causing her injuries, and the glass on a cabinet door was broken.[6] Mother has also been involved in a number of physical altercations with other women, including her sister.[7] Mother even had physical altercations with her own mother while living with her. Mother has been arrested approximately fourteen times, including for assault, possessing drugs, or some type of alcohol-related offense.

### 4. Service Plan

Conservatorship worker Samantha Perez testified that Mother did not successfully complete her service plan. Mother was asked to complete an MHMR assessment, among other things. Weatherford MHMR recommended medication management and ongoing treatment for Mother, but at the time of trial, Mother was not taking medication and had indicated "that she will not take medicine for bipolar." Perez reviewed notes from Dr. Lane and "felt like there wasn't truthful discussions as far as any assault charges or anger problems or anything about her mental health. I felt like she . . . hasn't ever thought that there was a problem." Perez opined that

---

[6]Father claimed that the altercation began when Mother shook an iron skillet at him.

[7]Mother testified that the fight with her sister caused Mother to miscarry.

Mother had not alleviated the risks to A.C. associated with Mother's mental health and domestic violence issues.

### 5. Holding

Viewing the evidence under the appropriate standards of review, the jury could have formed a firm belief or conviction that Mother engaged in endangering conduct and exposed A.C. to endangering conditions. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573–74. The evidence is legally and factually sufficient to support the jury's affirmative termination finding based on subsection 161.001(b)(1)(D) and (E). We overrule this part of Mother's second issue.

## D. Father's Endangerment Finding

Father is bipolar, was diagnosed with depression, has experienced suicidal ideations, and was once involuntarily committed to a state hospital for five days. Unlike Mother, Father does not outright deny being bipolar, but he has taken his medication inconsistently, telling CASA volunteer Shirly Baker only four months before trial that he was not taking his medication.

Father has been arrested seven times, including for assault-bodily injury and for DWI. Father was arrested for assault family violence by choking following the incident with Mother while she was pregnant. Even though by Father's own account he "roughed up [Mother] pretty good"—Father told a police officer that he had "choked [Mother] to the ground," and the officer observed blood spatter and loose strands of hair on the floor—Mother was ultimately uncooperative with authorities

15

and declined to prosecute. Father's mother has observed Father drink excessively since A.C. was born.

Father engaged in endangering conduct with A.C. during the pendency of the case that concerned both TDFPS and S.S. S.S. recalled one incident in which Father returned A.C. after a visit, and A.C.—looking fearful and pointing to his head—said "dada hit head." S.S., who thought that Father had intentionally struck A.C., took A.C. to the emergency room. On another occasion, A.C.'s clothes were wet when Father returned him after a visit on a cold day. Father had taken A.C. to the lake and let him walk around in the water, something that S.S. thought was inappropriate to do on a fifty-degree day. At another return, Father was driving with A.C. on his lap.[8] S.S. testified that she would be concerned for A.C.'s safety if Father's parental rights were not terminated.

Sometime around late June 2017, Father indicated that he wanted to relinquish his parental rights to A.C. Father "felt like he wasn't stable enough to care for [A.C.]," the cost of his medication was increasing, his mother was kicking him out of her house, and "he just wasn't in a place to raise a child." Perez first heard that Father wanted to retain his parental rights when he testified at trial in February 2018. Father's vacillating between wanting to relinquish his rights and wanting to retain them concerned S.S.

_____

[8]Father claimed he only drove in the parking lot.

16

Significantly, TDFPS expressed concern that Father would not be protective of A.C. if Mother's parental rights were terminated but his were not. According to counselor Rita Benson, Mother and Father argued constantly—Benson could not separate the two when they argued during counseling—but would probably maintain a relationship even after their marriage was dissolved despite the volatility.[9] At an earlier hearing, Father said that Mother was mentally unstable and would never be able to care for A.C., but he changed his tune at trial and repeatedly qualified his prior negative comments about Mother. Father left A.C. in Mother's care despite harboring serious concerns about her mental health.

Father has a history of moving from place to place, and at the time of trial, concerns existed whether the house in which he was living and renovating was safe for a two-year-old child.[10] And like Mother, Father failed to successfully complete his service plan. Perez expressed concern about "the overall safety of the child and the mental health of both of the parents."

Viewing the evidence under the appropriate standards of review, the jury could have formed a firm belief or conviction that Father engaged in endangering conduct and exposed A.C. to endangering conditions. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *J.P.B.*, 180 S.W.3d at 573–74. The evidence is legally and

---

[9]Father's mother likened his relationship with Mother to oil and water.

[10]Perez described the property as a construction site.

17

factually sufficient to support the jury's affirmative termination finding based on subsection 161.001(b)(1)(D) and (E). We overrule this part of Father's first issue.

## E. Best Interest Findings

We review the entire record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Nonexclusive factors that the trier of fact in a termination case may also use in determining the best interest of the child include (a) the desires of the child; (b) the emotional and physical needs of the child now and in the future; (c) the emotional and physical danger to the child now and in the future; (d) the parental abilities of the individuals seeking custody; (e) the programs available to assist these individuals to promote the best interest of the child; (f) the plans for the child by these individuals or by the agency seeking custody; (g) the stability of the home or proposed placement; (h) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (i) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors"); *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). These factors are not exhaustive, and some listed factors may be inapplicable to some cases. *C.H.*, 89 S.W.3d at 27.

Regarding Mother, the evidence that supports the subsection (D) and (E) findings—untreated severe mental illness, domestic violence, excessive alcohol use, other erratic and concerning behavior, and incomplete service plan—is probative of

18

the best interest finding. *See E.C.R.*, 402 S.W.3d at 250. Further, Mother is unemployed, relies on disability for financial support, and lives in a house owned by someone else.

As to Father, the evidence that supports the subsection (D) and (E) findings— inconsistently treated mental illness, domestic violence, alcohol use, miscellaneous concerning behavior, and incomplete service plan—is likewise probative of the best interest finding. *See Id.* Father is also on disability for a mental-health issue— although he periodically works in construction—and has a history of unstable housing.

By contrast, S.S. lives on a family property, is employed as a substitute teacher, can support A.C. financially, and wants to adopt him. Under S.S.'s care (since July 1, 2016), A.C. has "made a lot of progress, developmentally" and continues to grow and to thrive. Several people opined that it is in A.C.'s best interest for Mother's and Father's parental rights to be terminated.

Considering the relevant *Holley* factors, the jury could reasonably have formed a firm belief or conviction that termination of both Mother's and Father's parental rights to A.C. is in A.C.'s best interest. *See J.P.B.*, 180 S.W.3d at 573; *Holley*, 544 S.W.2d at 371–72. The evidence is legally and factually sufficient to support the jury's best interest findings. We overrule the remainder of Mother's second issue and the remainder of Father's first issue. We need not reach any of their other arguments in those issues. *See* Tex. R. App. P. 47.1.

19

## IV. REMAINING ISSUES

## A.   Religious Freedom and Constitutionality of Section 161.003

In her interrelated third and fourth issues, Mother argues (i) that TDPFS violated her right to religious freedom by "t[aking] away her baby based on [her] religious beliefs" and (ii) that family code section 161.003 is unconstitutional as applied to her "because [her] religious beliefs were used against her as a mental illness."   However, as we thoroughly explained above, the record objectively demonstrates that TDFPS did not remove A.C. or seek to terminate Mother's parental rights on account of her religious beliefs but because she had engaged in endangering conduct and exposed A.C. to endangering conditions unrelated to her religion.   Insofar as TDFPS elicited testimony of Mother's religious beliefs during trial, context reveals that TDFPS did so to show that Mother's beliefs were potentially harmful to A.C.[11]  *See Maltos v. Tex. Dep't of Protective & Regulatory Servs.*, 937 S.W.2d 560, 564 (Tex. App.—San Antonio 1996, no writ) (approving jury instruction that "[a] parent's religious beliefs, teachings, and practice, in and of themselves, are not grounds for terminating the parental rights of the parents to the child, *unless the*

_____

[11]Mother testified, "I hate this planet.  I want to go back to where we belong and that's heaven, okay, where things are perfect and we don't have to put up with Satanized people and crap like that. . . .  So if I had to marry a man in order to have that child in order to end it, then that's what I did."  Asked how her religious beliefs would affect her raising A.C., Mother denied that it would affect A.C. but also that "if he has another God besides the God, it will cost him his life."  Mother later explained that A.C. was in no real harm, but the jury could have disbelieved her testimony.

*teachings and practices of the beliefs are illegal, immoral, or demonstrably harmful to the child*")
(emphasis added)).

As for Mother's constitutional challenge to section 161.003, not only can we locate no such objection at trial, *see* Tex. R. App. P. 33.1(a), but the issue is moot because we concluded that legally and factually sufficient evidence supported the jury's termination findings based on subsections 161.001(b)(1) (D) and (E), not on section 161.003. We overrule Mother's third and fourth issues.

## B.    Expert Witness Disclosures

In her fifth issue, Mother argues that the trial court abused its discretion by permitting counselor Rita Benson and police officer Dustin Paulsen to testify because instead of fully disclosing their opinions at least ninety days before trial, TDFPS only partially disclosed their opinions eighty-four days before trial. *See* Tex. R. Civ. P. 194.2(f) (providing that party may request disclosure of, among other things, the subject matter on which the expert will testify and the general substance of an expert's mental impressions and opinions), 195.2(a) (requiring information to be furnished under rule 194.2(f) ninety days before discovery's end).

A party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, unless the court finds that (1) there was good cause for the failure to timely disclose or (2) the failure will not unfairly surprise or prejudice the other parties. Tex. R. Civ. P. 193.6(a). "The salutatory purpose of [this rule] is to require

21

complete responses to discovery so as to promote responsible assessment of settlement and prevent trial by ambush." *Alvarado v. Farah Mfg. Co.*, 830 S.W.2d 911, 914 (Tex. 1992) (op. on reh'g) (applying predecessor rule). A finding of good cause or the lack of unfair surprise or unfair prejudice must be supported by the record. Tex. R. Civ. P. 193.6(b). We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *J.P.B.*, 180 S.W.3d at 575.

The trial court ruled that TDFPS's witnesses could testify after clarifying that the disclosures were, at most, six days late (or eighty-four days before trial) and after TDFPS's counsel explained that Mother knew what the witness would testify about. On this record, the trial court could have reasonably concluded that TDFPS met its burden to show that Mother sustained no unfair surprise or prejudice. *See* Tex. R. Civ. P. 193.6(a)(2), (b); *Spurck v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 214–17 (Tex. App.—Austin 2013, no pet.) (observing that trial court could have implicitly made rule 193.6(a) findings based on record). And in any event, any error in permitting the witnesses to testify was harmless because their testimony was largely cumulative of other evidence admitted at trial. *See Owens-Corning Fiberglas Corp. v. Malone*, 916 S.W.2d 551, 557 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 972 S.W.2d 35 (Tex. 1998). We overrule Mother's fifth issue.

## C.     Ineffective Assistance

Mother argues in her sixth issue that her trial counsel was ineffective for failing to seek relief under the Texas Religious Freedom Restoration Act and for failing to

22

assert a violation of her right to religious freedom under both the First Amendment and article I, section 6 of the Texas constitution. *See* U.S. Const. amend. I; Tex. Const. art I, § 6; Tex. Civ. Prac. & Rem. Code Ann. §§ 110.001–.012 (West 2011).

To establish ineffective assistance of counsel, an appellant must show by a preponderance of the evidence that her counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013). The prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial with a reliable result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show there is a reasonable probability that, without the deficient performance, the result of the proceeding would have been different. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308.

Mother is incapable of making a showing of prejudice because, regardless of any objection premised upon religious freedom, sufficient evidence otherwise supports the jury's subsections 161.001(b)(1) (D) and (E) and best interest findings. We overrule Mother's sixth issue.

## D. Pretrial Mediation

In Mother's seventh issue and in Father's second issue, they argue that the trial court erred by failing to abide by the local rules and send the case to mediation before trial. Local rule 3.2 provides in relevant part that "[e]xcept for good cause shown,

mediation shall be completed prior to the pre-trial conference or, at the latest, prior to trial." Parker County District Courts and County Courts at Law Loc. R. 3.2. The same trial judge who presided over the trial also presided over numerous pretrial hearings in this cause. Familiar with the parties and the nature of the disputed issues, the trial court could have reasonably concluded that good cause existed to proceed to trial without first ordering mediation. We overrule Mother's seventh issue and Father's second issue.

## V. CONCLUSION

Having overruled all of Mother's and Father's issues, we affirm the trial court's final order terminating Mother's and Father's parental rights to A.C.

/s/ Bill Meier
Bill Meier
Justice

Delivered: October 24, 2018

24